**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>v.<br><br>HARLEY INTERNATIONAL (CAYMAN) LIMITED,<br>        Defendant. | Adv. Pro. No. _____ (BRL) |

## COMPLAINT

    Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et. seq.* ("SIPA"), by and through his undersigned counsel,

for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.       This adversary proceeding arises from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff").  In early December 2008, BLMIS generated client account statements for its nearly 7,000 client accounts at BLMIS.  When added together, these statements purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts.  Defendant Harley International (Cayman) Limited ("Defendant Harley" or "Defendant") received avoidable transfers from BLMIS, and the purpose of this proceeding is to recover the avoidable transfers received by the Defendant.

2.       Defendant Harley knew or should have known that its account statements at BLMIS did not reflect legitimate trading activity and that Madoff was engaged in fraud.  From at least 1996 until 2008, Defendant Harley received unrealistically high and consistent annual returns, approximating 13.5%, in contrast to the vastly larger fluctuations in the S & P 100 Index on which Madoff's trading activity was purportedly based during the time period.  Between 1998 and 2008, at least 148 purported trades reflected on Defendant's monthly customer account statements were allegedly exercised at prices outside the daily range for such securities traded in the market on the days in question, a fact that easily could have been confirmed by any investment professional managing the account.  In just the 90 days prior to Madoff's public disclosure of the Ponzi scheme, Defendant Harley withdrew $425 million from BLMIS, which it knew or should have known was non-existent principal and other investors' money.  Defendant Harley knew or should have known that BLMIS was engaged in fraud based on these facts and the numerous other indicia of fraud described herein.

3.      This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3) sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of 11 U.S.C. §§ 101, *et. seq.* (the

"Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. § 270, *et.*

*seq.* (McKinney 2001)), and other applicable law, for turnover, accounting, preferences,

fraudulent conveyances, damages in connection with certain transfers of property by BLMIS to

or for the benefit of Defendant.  The Trustee seeks to set aside such transfers and preserve the

property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding brought in this Court, the Court in which the

main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.

The SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C.

§§ 78eee(b)(2)(A), (b)(4).

5.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (F), (H) and

(O).

6.      Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

7.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment

adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange

Commission ("SEC") filed a complaint in the District Court which commenced the District

Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending

in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud

through the investment advisor activities of BLMIS.

8.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order, which appointed Lee S. Richards, Esq., as receiver for the assets of BLMIS.

9.      On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed

an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.

10.     Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

        (a)     appointed the Trustee for the liquidation of the business of BLMIS

pursuant to 15 U.S.C. § 78eee(b)(3);

        (b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15

U.S.C. § 78eee(b)(3); and

        (c)     removed the case to this Bankruptcy Court pursuant to 15 U.S.C.

§ 78eee(b)(4).

11.     By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

12.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff,* Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23: 14-17.)  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (*Id.* at 23: 20-21.)

13.    As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway.  However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences, non-existent principal and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme.  Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

14.    Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by

SIPA pursuant to 15 U.S.C. § 78fff(b).  Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of

the Bankruptcy Code are applicable to this case.

15.    Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the

filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and

the date of the commencement of the case within the meaning of section 544 of the Bankruptcy

Code.

16.    The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1

and the Bankruptcy Code, including (11 U.S.C. § 101, *et seq*.), including sections 323(b) and

704(a)(1) because, among other reasons:

(a)    BLMIS incurred losses as a result of the claims set forth herein;

(b)    The Trustee is a bailee of customer funds entrusted to BLMIS for

investment purposes; and

(c)    The Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, "Accountholders").  As of this date, the Trustee has received multiple express

unconditional assignments of the applicable Accountholders' causes of action, which actions

could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of

persons who have suffered injury, in fact, and a distinct and palpable loss for which the Trustee

is entitled to reimbursement in the form of monetary damages.

## THE FRAUDULENT PONZI SCHEME

17.     BLMIS is a New York limited liability company that is wholly owned by Madoff.

Founded in 1960, BLMIS operated from its principal place of business at 885 Third Avenue,

New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS

together with several family members and a number of additional employees.  BLMIS had three

business units: investment advisory (the "IA Business"), market making and proprietary trading.

18.     Outwardly, Madoff ascribed the IA Business' consistent investment success to his

investment strategy called the "split-strike conversion" strategy.  Madoff promised clients that

their funds would be invested in a basket of common stocks within the S&P 100 Index, which is

a collection of the 100 largest publicly traded companies.  The basket of stocks would be

intended to mimic the movement of the S&P 100 Index.  Madoff asserted that he would carefully

time purchases and sales to maximize value, but this meant that the clients' funds would

intermittently be out of the market.  During these times, Madoff asserted that the funds would be

invested in United States issued securities.  The second part of the split-strike conversion

strategy was the hedge of such purchases with option contracts.  Madoff purported to purchase

and sell option contracts corresponding to the stocks in the basket, thereby controlling the

downside risk of price changes in the basket of stocks.

19.     Although clients of the IA Business received monthly or quarterly statements

purportedly showing the securities that were held in, or had been traded through, their accounts,

and the growth of and profit from those accounts over time, these statements were a complete

fabrication.  The security purchases and sales depicted in the account statements never occurred

and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he

never in fact purchased any of the securities he claimed to have purchased for customer accounts.

300010834

Indeed, based on the Trustee's investigation to date, there is no record of BLMIS having cleared

a single purchase or sale of securities in connection with the split/strike conversion strategy at

the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any

other trading platform on which BLMIS could have reasonably traded securities.

20.     Prior to his arrest, Madoff assured clients and regulators that he conducted trades

on the over-the-counter market, after hours.  To bolster that lie, Madoff periodically wired tens

of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a

London based entity wholly owned by Madoff.  There are no records that MSIL ever used the

wired funds to purchase securities for the accounts of the IA Business clients.

21.     Additionally, based on the Trustee's investigation to date, there is no evidence

that the IA Business ever purchased or sold any of the options that Madoff claimed on customer

statements to have purchased.  All traded options related to S&P 100 companies, including

options on the index itself, clear through the Options Clearing Corporation ("OCC").  Based on

the Trustee's investigation to date, the OCC has no records of the IA Business having transacted

in any exchange-listed options.

22.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme

and Madoff and BLMIS concealed the ongoing fraud in an effort to hinder and delay other

current and prospective customers of BLMIS from discovering the fraud.  The money received

from investors was not set aside to buy securities as purported, but instead, was primarily used to

make the distributions to, or payments on behalf of, other investors.  The money sent to BLMIS

for investment, in short, was simply used to keep the operation going and to enrich Madoff, his

associates and others, including the Defendant, until such time as the requests for redemptions in

December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

23.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of them, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

24.     When payments were made to or on behalf of these investors, including the Defendant, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors the inflated amount reflected in the falsified financial statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances.

25.     BLMIS used the funds deposited from investors or investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other account holders, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

26.     In an effort to hinder, delay and defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

27.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for

Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23

customer accounts and assets under management of approximately $17.1 billion.  In fact, in

January 2008, BLMIS had over 4,900 active customer accounts with a purported value of

approximately $68 billion under management.

28.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports

"prepared" by Friehling & Horowitz, a three person accounting firm in Rockland County, New

York.  Of the three employees at the firm, one employee was an assistant and one was a semi-

retired accountant living in Florida.

29.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars

greater than the assets of BLMIS.  At all times relevant hereto, BLMIS was insolvent in that

(i) its assets were worth less than the value of its liabilities, (ii) it could not meet its obligations

as they came due, and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

30.     This and similar complaints are being brought to recapture monies paid to or for

the benefit of certain investors so that this customer property can be equitably distributed among

all of the victims of BLMIS in accordance with the provisions of SIPA.

## THE DEFENDANT AND THE TRANSFERS

31.     Defendant Harley International (Cayman) Limited is an international business

company organized under the laws of the Cayman Islands, with a principal place of business at

P.O. Box 156, North Quay, Douglas, Isle of Man, 1M99 I NR, care of Fortis Prime Fund

Solutions (IOM) Limited.

32.     At all times relevant hereto, Defendant was a client of the IA Business. According to BLMIS' records, Defendant maintained an account with BLMIS, which was designated account 1FN094 (the "Account"). The Account was opened on or about April 24, 1996 in the name of Harley International Limited, a Bahamian international business company. Thereafter, Harley International Limited ceased to be a Bahamian registered company and changed its place of organization to the Cayman Islands. Defendant executed a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options, (the "Account Agreements") and delivered such papers to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

33.     By their terms, the Account Agreements were deemed to be entered into in the State of New York, and were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were held in New York, New York, and the Defendant consistently wired funds to the BLMIS Bank Account in New York, New York for application to the Account and the conducting of trading activities.

34.     Between April 24, 1996 and the Filing Date, the Defendant invested over two billion dollars with BLMIS through 133 separate wire transfers directly into BLMIS' account at JPMorgan Chase & Co., Account #000000140081703 (the "BLMIS Bank Account"). The BLMIS Bank Account was maintained at a JPMorgan Chase & Co. branch in New York, New York. Defendant has intentionally taken advantage of the benefits of conducting transactions in the State of New York and has submitted itself to the jurisdiction of this Court for purposes of this proceeding.

11

35.     Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") to the Defendant.  The Transfers were made to or for the benefit of the Defendant and include, but are not limited to, the Transfers listed on Exhibit A.

36.     Upon information and belief, Defendant knew or should have known that Madoff's IA Business was predicated on fraud.  Hedge funds and fund of funds like the Defendant's were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff. The Defendant failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme.  Among other things, the Defendant was on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

(a)     Financial industry press reports, including a May 27, 2001 article in Barron's entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in MAR/Hedge, a semi-monthly newsletter that is widely read by hedge fund industry professionals, entitled "Madoff Tops Charts; Skeptics Ask How," raised serious questions about the legitimacy of BLMIS and Madoff and their ability to achieve the IA Business returns they purportedly had achieved using the split-strike conversion strategy Madoff claimed to employ.

(b)     Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.

(c)     BLMIS did not provide its customers with electronic real-time online access to their accounts, which was and is customary in the industry for hedge fund and fund of

funds investors.  BLMIS also utilized outmoded technology, including paper trading
confirmations.  The use of paper confirmations created after the fact was critical to Madoff's
ability to perpetuate his Ponzi scheme.

(d)     BLMIS functioned as both investment manager and custodian of
securities.  This arrangement eliminated another frequently utilized check and balance in
investment management by excluding an independent custodian of securities from the process,
and thereby furthering the lack of transparency of BLMIS to investors, regulators, and other
outside parties.

(e)     BLMIS produced returns that were too good to be true, reflecting a pattern
of abnormal profitability, both in terms of consistency and amount that was simply not credible.
Specifically, there were only about four months of any negative returns during the 152 months of
reported operations in which Defendant was a customer of BLMIS.  Returns this good could not
be reproduced by other skilled hedge fund managers, and those managers who attempted to
employ the split-strike conversion strategy purportedly used by BLMIS consistently failed even
to approximate its results.

(f)     The Defendant received far higher purported annual rates of return on its
investments with BLMIS, approximating 13.5%, as compared to the interest rates BLMIS could
have paid to commercial lenders during the relevant time period.  Upon information and belief,
the Defendant never questioned why Madoff accepted its investment capital in lieu of other
available alternatives that would have been more lucrative for BLMIS.

(g)     At times the Defendant's monthly account statements reflected trades
purchased or sold on behalf of Defendant's account in certain securities that were allegedly

executed at prices outside the daily price range of prices for such securities traded in the market on the days in question.  The Defendant received purported trade confirmations from BLMIS matching the securities transactions reported on the monthly account statements which, if verified with the prices in the market on the trade dates in question, would have revealed that the trades could not have been executed at the prices reported.  For example, Defendant's October 2003 monthly account statement reported a purchase of 385,693 shares of Intel Corporation (INTC) with the settlement date of October 7, 2003, which was purportedly executed on the trade date of October 2, 2003 at a price of $27.63.  The daily price for Intel Corporation stock on October 2, 2003 ranged from a low of $28.41 to a high of $28.95, which made the reported price impossible.  Similar impossibilities were reported in connection with purported sales of securities in Defendant's account.  Defendant's December 2006 account statement reported a sale of 236,663 shares of Merck & Co. (MRK) at a purported executed price of $44.61on the Trade Date of December 22, 2006 with a Settlement Date of December 28, 2006.  However, the daily price range for Merck stock on the purported trade date of December 22, 2006 ranged from a low of $42.78 to a high of $43.42, more than $1 below the price reported on the statement.

(h)     The Trustee's investigation to date has revealed at least 148 instances between February 1998 to November 2008 in which Defendant's account statements displayed trades purportedly executed at a price outside the daily price range.  This pattern in Defendant's account should have caused a sophisticated hedge fund like Defendant Harley and its managers to independently verify the trades with the public exchanges and demand more transparency into the operations of BLMIS.

(i)     BLMIS would have had to execute massive numbers of options trades to implement its purported split-strike conversion strategy.  In order to implement this strategy,

BLMIS purportedly purchased options on the S&P 100 index ("OEX") – which are traded on the

Chicago Board Options Exchange ("CBOE") – in combination with purchases of select

underlying stocks that are components of that index.  At times, the option volume BLMIS

reported to its customers was simply impossible if those options had been exchange-traded.  For

example, on January 23, 2008, BLMIS purportedly bought a total of 22,641 OEX put options

(with February expiration and a strike price of 600) for Defendant Harley when the total volume

traded on the CBOE for such contracts was 8,645.  Similarly, BLMIS purportedly bought a total

of 22,641 OEX call options (with February expiration and a strike price of 610) for Defendant

Harley when the total volume traded on the CBOE for such contracts was 631.  In each of these

instances, Defendant knew or should have known that the option trading volumes reported by

BLMIS were impossible if exchange-traded.

(j)     BLMIS had purportedly told its investors that it purchased these options in

the over-the-counter ("OTC") market.  Trading options in the OTC market would likely have

been more expensive than trading over the CBOE, yet those costs did not appear to be passed on

to BLMIS' investors.  The absence of such costs, together with BLMIS' representation that it

was trading in the OTC market, should have prompted a sophisticated hedge fund like Defendant

Harley and its managers to request verification of the trades and demand more transparency into

the operations of BLMIS.

(k)     BLMIS's statements to investors reflected a consistent ability to trade

stocks near their monthly highs and lows to generate consistent and unusual profits (or, if

requested by customers, to generate losses to do the opposite).  No experienced investment

professional could have reasonably believed that this could have been accomplished legitimately.

(l)     BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall.  No experienced investment professional could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

(m)     The compensation system utilized by BLMIS was atypical, in that BLMIS, the entity purportedly employing the hugely-successful proprietary trading system, was compensated only for the trades that it executed, while Defendant, whose only role was to funnel money to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS.  This compensation arrangement, together with the lack of transparency and other factors listed herein, should have caused an experienced investment entity like the Defendant and its managers to question the legitimacy of Madoff's operation.

(n)     Despite its immense size, BLMIS was substantially a family-run operation, employing many of Madoff's relatives, and virtually no outside professionals.

(o)     On information and belief, at no time did the Defendant conduct a performance audit of BLMIS or match any trade tickets provided by BLMIS with actual trades executed through any domestic or foreign public exchange despite the fact the Defendant fund had hundreds of millions of dollars in assets and easily could have afforded to do this.

(p)     BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS's purported trading activities from scrutiny.

(q)      Based on all of the foregoing factors, many banks, industry advisors and insiders who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that their IA Business operations were not legitimate.  At a minimum, these factors, in combination with the indicia of fraud in Defendant Harley's own customer account statements, should have caused the Defendant to inquire further.

37.      The Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78lll(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

38.      The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts ("Fictitious Profits").

39.      The Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. CPRL 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273 – 276 (McKinney 2001).

40.      Of the Transfers, at least fourteen transfers in the collective amount of $1,072,800,000 (the "Six Year Transfers") were made during the six years prior to the Filing Date and are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273 – 276.

41.      Of the Six Year Transfers, at least thirteen in the collective amount of $1,066,800,000 (the "Two Year Transfers") were made during the two years prior to the Filing

Date, and are additionally recoverable under sections 548(a)(1), 550(a)(1) and 551 of the

Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

42.     Of the Two Year Transfers, at least six in the collective amount of $425,000,000

(the "90 Day Transfers") were made during the 90 days prior to the Filing Date, and are

additionally recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code and

applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

43.     To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pled in the alternative.

44.     The Trustee's investigation is on-going and the Trustee reserves the right to

(i) supplement the information on the Transfers and any additional transfers, and (ii) seek

recovery of such additional transfers.

### COUNT ONE
### TURNOVER AND ACCOUNTING – 11 U.S.C. § 542

45.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

46.     The Transfers constitute property of the estate to be recovered and administered

by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

47.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the

Trustee is entitled to the immediate payment and turnover from the Defendant of any and all

Transfers made by BLMIS, directly or indirectly, to Defendant.

48.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Transfers received by Defendant from BLMIS, directly or indirectly.

**COUNT TWO**
**PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550, AND 551**

49.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

50.     At the time of each of the 90 Day Transfers (hereafter, the "Preference Period Transfers"), the Defendant was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

51.     Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

52.     Each of the Preference Period Transfers was to or for the benefit of the Defendant.

53.     Pleading in the alternative, each of the Preference Period Transfers was made on account of an antecedent debt owed by BLMIS before such transfer was made.

54.     Each of the Preference Period Transfers was made while BLMIS was insolvent.

55.     Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

56.    Each of the Preference Period Transfers enabled Defendant to receive more than the receiving Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

57.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Defendant pursuant to section 550(a).

58.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

59.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

60.    The Two Year Transfers were made on or within two years before the filing date of BLMIS' case.

61.    The Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

300010834

62.     The Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendant pursuant to section 550(a).

63.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS.

**COUNT FOUR**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550, AND 551**

64.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

65.     The Two Year Transfers were made on or within two years before the Filing Date.

66.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

67.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

68.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

69.     At the time of each of the Two Year Transfers, BLMIS intended to incur, or

believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts

matured.

70.     The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee

pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendant

pursuant to section 550(a).

71.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of

the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two

Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the

Two Year Transfers, or the value thereof,  from the Defendant for the benefit of the estate of

BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

72.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

73.     At all times relevant to the Six Year Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under section 502 of the Bankruptcy Code or that were and are not

allowable only under section 502(e).

74.     The Six Year Transfers were made by BLMIS with the actual intent to hinder,

delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the

benefit of the Defendant in furtherance of a fraudulent investment scheme.

75.    As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant.

**COUNT SIX**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107**

76.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

77.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

78.    BLMIS did not receive fair consideration for the Six Year Transfers.

79.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

80.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278 and 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551, AND 1107

81.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

82.     At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

83.     BLMIS did not receive fair consideration for the Six Year Transfers.

84.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or

was about to engage in a business or transaction for which the property remaining in its hands

after each of the Six Year Transfers was an unreasonably small capital.

85.     As a result of the foregoing, pursuant to sections 274, 278 and/or 279 of the New

York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code, the

Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers,

(b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers,

or the value thereof, from the Defendant for the benefit of the estate of BLMIS.

## COUNT EIGHT
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

86.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

300010834

87.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code, or that were and are not allowable only under section

502(e).

88.    BLMIS did not receive fair consideration for the Six Year Transfers.

89.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

90.    As a result of the foregoing, pursuant to sections 275, 278 and/or 279 of the New

York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, the

Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b)

directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or

the value thereof,  from the Defendant for the benefit of the estate of BLMIS.

## COUNT NINE
### UNDISCOVERED FRAUDULENT TRANSFER – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

91.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

92.    At all times relevant to Transfers, the fraudulent scheme perpetrated by BLMIS

was not reasonably discoverable by at least one unsecured creditor of BLMIS.

93.    At all times relevant to the Transfers, there have been one or more creditors who

have held and still hold matured or unmatured unsecured claims against BLMIS that were and

are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

94.   The Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Transfers to or for the benefit of the Defendant in furtherance of a fraudulent investment scheme.

95.   As a result of the foregoing, pursuant to NY CPLR 203(g) sections 276, 276-a, 278 and/or 279 of the and New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendant as follows:

i.   On the First Claim for Relief, pursuant to sections 542, 550(a), and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by the Defendant of the property that was the subject of the Transfers or the value of such property;

ii.   On the Second Claim for Relief, pursuant to sections 547, 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

iii.        On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

iv.        On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

v.        On the Fifth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant;

vi.        On the Sixth Claim for Relief, pursuant to sections 273, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, and  551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

vii.        On the Seventh Claim for Relief, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551, and 1107 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be

set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the state of BLMIS;

viii.     On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law sections 275, 278 and/or 279 and Bankruptcy Code sections 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof,  from the Defendant for the benefit of the estate of BLMIS;

ix.     On the Ninth Claim for Relief, pursuant to NY CPLR 203(g) and sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and section 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant;

x.     On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001, 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xi.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

xii.     On all Claims for Relief, assignment of Defendant's rights to seek refunds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

xiii.    Awarding the Trustee all applicable interest, costs, and disbursements of this

action; and

xiv.    Granting Plaintiff such other, further, and different relief as the Court deems just,

proper, and equitable.

Date:   New York, New York
        May 12, 2009

                                                s/David J. Sheehan
Of Counsel:                                     Baker & Hostetler LLP
                                                45 Rockefeller Plaza
Elizabeth A. Scully                             New York, New York 10111
Michael Powell                                  Telephone: (212) 589-4200
Baker & Hostetler LLP                           Facsimile: (212) 589-4201
Washington Square, Suite 1100                   David J. Sheehan
1050 Connecticut Avenue, N.W.                   Email: dsheehan@bakerlaw.com
Washington, D.C. 20036                          Marc E. Hirschfield
Telephone: (202) 861-1500                       Email: mhirschfield@bakerlaw.com
Facsimile: (202) 861-1783                       Thomas M. Wearsch
Elizabeth A. Scully                             Email:  twearsch@bakerlaw.com
Email:  escully@bakerlaw.com
Michael Powell                                  *Attorneys for Irving H. Picard, Esq.,*
Email:  mpowell@bakerlaw.com                    *Trustee for the SIPA Liquidation of Bernard L.*
                                                *Madoff Investment Securities LLC*